**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

ARGANO ULTIMATE HOLDINGS, LLC and ARGANO, LLC

Plaintiffs,

v.

DONYATI, LLC, RONALD GUADAGNO, DYANA KARCHER, MELISSA O'BLENIS, WILLIAM POSEY, and DANIELLE WHITE

Defendants.

**CIVIL ACTION No. __________**

COMPLAINT
Demand for Jury Trial

Plaintiffs Argano Ultimate Holdings, LLC and Argano, LLC (together, "Argano") bring this action against Defendant Donyati, LLC ("Donyati") and Defendants Ronald Guadagno, Dyana Karcher, Melissa O'Blenis, William Posey, and Danielle White (collectively, the "Individual Defendants").

**INTRODUCTION**

1. This is a case about Argano's industry-leading software consulting business, and Donyati's unlawful acts which it undertook in an attempt to break into Argano's market and take its customers. Specifically, Donyati, an Argano competitor, hired at least six of Argano's former employees to obtain many thousands of Argano trade secret files, including thousands of confidential Argano technical, business, and financial files—including Argano computer code—that a forensic analysis revealed were downloaded in the weeks (and sometimes days) leading up to their departures from Argano to Donyati. As a result, Donyati improperly gained access to numerous Argano trade secrets relating to Argano's industry-leading software consulting

technologies. In the process, with Donyati's knowledge and encouragement, these former Argano employees also breached their ongoing contractual obligations to Argano, including to maintain the confidentiality of confidential Argano materials. If left unchecked, Defendants threaten to fundamentally undermine Argano's competitive advantage and significant investments in its proprietary intellectual property.

2. Founded in 2020 in Plano, Texas, Argano is the world's largest digital consultancy and provides design and delivery services to high-performance business operations that enable its customers to transform the way they operate. Since its founding, Argano has established itself globally in the digital services industry and received broad industry recognition and accolades, including the 2024 Oracle Partner Award for the North America Innovation Category. Argano has become a single-source partner for cloud consulting services and solutions, and has developed specialized expertise in providing such services for Oracle systems, including the Enterprise Performance Management ("EPM") area. Argano and Oracle have for years co-hosted demand generation events, during which clients and potential clients learn about EPM products and services, including in hands-on sessions. One of the ways Argano invested substantial resources into its EPM expertise was by acquiring InterRel Consulting in 2021. Through this acquisition, Argano gained specialized expertise in EPM financial planning, consolidation, reporting, and analytics solutions.

3. Argano's position as a leader in the industry has not come cheaply. Argano makes significant investments each year in developing technologies and business strategies for the benefit of its customers. For many years, Argano has employed engineers and other IT professionals throughout the country, and spent hundreds of millions of dollars annually to research new technologies and IT solutions. Additionally, Argano invested substantial resources in EPM

offerings when it acquired InterRel Consulting in 2021. Through this acquisition, Argano expanded its expertise in EPM financial planning, consolidation, reporting, and analytics solutions. Argano's valuable innovations require protection, and Argano relies on its trade secrets to safeguard the intellectual property created by the ingenuity and industry of its employees.

4. Donyati's story is the opposite. Recently, Donyati has attempted to inject itself into Argano's market for EPM consulting services, representing on its website that its "strength lies in our deep knowledge of the Oracle EPM ecosystem."[1] But before Donyati targeted and managed to lure away Argano's employees—and through them, Argano's trade secrets—Donyati's ability to service cloud software applications was limited. Donyati principally focused on systems implemented at physical locations, such as client sites, or on a server. Donyati was unable to compete in any meaningful way for services work for cloud-based software applications before the unlawful conduct addressed herein.

5. Donyati's ability to win and perform IT services work lagged behind that of Argano, Donyati embarked on an unlawful plot to surreptitiously take Argano's confidential and proprietary trade secrets and use those trade secrets to jump-start its competing cloud-based offerings. Donyati's plan to steal Argano's trade secrets was a multi-faceted one, but included as a central pillar a plot to target Argano from the inside through its personnel—namely, by recruiting Argano personnel who had substantial access to Argano's trade secrets, and who, acting in furtherance of their agreed-upon employment at Donyati, downloaded thousands of confidential technical, business, and financial documents in the weeks (and sometimes days) prior to their departures—after they had accepted employment with Donyati, and in furtherance of their new jobs.

---

[1] *Oracle Partner*, DONYATI, https://donyati.com/oracle-partner/ (last visited July 28, 2025).

6. Specifically, from October 2024 through at least April 2025, Donyati systematically and continuously executed its targeted hiring scheme by luring away at least six employees who had access to a broad swath of Argano confidential documents and files in light of the roles they held at Argano: Ronald Guadagno (Vice President – Client Accounts), Dyana Karcher (Senior Manager – Delivery), Melissa O'Blenis (Director – Change Management), William Posey (Lead Consultant), Danielle White (Senior Director II of Delivery), and Joe Aultman (Management Consultant – Strategic Assessments) (collectively, the "Donyati Employees").

7. During their years of employment at Argano, the Donyati Employees were privy to a wide range of Argano proprietary technical implementation documents, including accelerators, scripts, and calculators; they were exposed and had access to Argano's product planning strategies, and research and development efforts; and they were also exposed to Argano's EPM business and technical analyses, including those related to the EPM technologies at issue in this case. And while that knowledge alone presented incalculable value to Donyati, leading up to their last days at Argano (and unbeknownst to Argano), the Donyati Employees surreptitiously downloaded and misappropriated thousands of technical, marketing, sales, financial, and customer-related documents related to multiple facets of Argano's EPM work. Critically, many of these unlawfully downloaded documents contained information reflecting Argano's specific technology implementations, including programming code containing Argano's proprietary ways to speed up implementation for its clients. These tools are referred to as accelerators, scripts, and calculators. The downloaded documents also included Argano's integration and work plans for services provided for customers, which are the result of Argano's hard work and expertise. The downloaded documents further included Argano's customer lists and open opportunities pipeline,

which are proprietary and confidential because they document promising business opportunities. Finally, the downloaded documents included Argano's financial and business plans, including summaries, strategies, and forecasting, which reflect confidential information about Argano's current offerings, consumer strategies, and forward-looking plans.

8. There is no question that the stolen materials are trade secrets, and that Defendants were aware of that fact. Considering the great harm that could befall Argano were its trade secrets to fall into the hands of a competitor, Argano takes substantial steps to make ensure their confidentiality, and to make clear to employees that this information must be kept confidential. For example, Argano conditions employment upon restrictive covenant agreements, which require employees to expressly acknowledge and agree that their access to Argano's confidential information is conditioned upon their agreement to use the confidential information only for the benefit of Argano. As another example, Argano posts a Resource Guide on its employee intranet system which also emphasizes the importance of keeping such information confidential. In addition to labeling customer information as proprietary and confidential, Argano also deploys IT measures to ensure that access to customer information is provided on a need-to-know basis. Access to documents and files are limited only to specific employees working on a solution for a particular customer. Others—even Argano employees--cannot access that customer's documents and files. Despite these clearly communicated obligations and procedures, the Donyati Employees, acting on behalf of Donyati, systematically, expansively, and brazenly downloaded Argano's documents and files before terminating employment with Argano—while working for Donyati—and began using Argano's documents and files once they commenced employment with Donyati. The Donyati Employees improperly retained, disclosed, and used Argano's confidential

and proprietary materials in breach of confidentiality obligations to Argano, in furtherance of their job responsibilities at Donyati, and for Donyati's benefit.

9. The evidence (including the results of forensic analysis) shows that since joining Donyati, the Donyati Employees have acquired and used Argano's trade secrets, including all technology documents related to Argano's cloud-based EPM offerings, such as Argano's accelerators, scripts, calculators, technology implementations, integration and work plans for customers, and customer lists. Donyati previously lacked the capacity to meaningfully compete with Argano in the cloud-based EPM space, instead focusing on systems implemented at physical locations. However, after the Donyati Employees joined Donyati, and after gaining access to Argano's trade secrets, Donyati expanded its offerings to include cloud-related services that compete for the same customers as Argano, in a timeframe that it could not have achieved without use of Argano's trade secrets Indeed, since misappropriating Argano's trade secrets, Donyati has begun bidding against Argano for—and are presumably serious contenders to win—clients and projects that it previously was unable to pursue due to a lack of expertise. Donyati's rapid rise in cloud-based EPM solution offerings would not have been possible but for its unlawful acquisition and use of Argano's trade secrets.

10. Defendants' brazen misappropriation and theft of trade secrets, the Individual Defendants' breach of contractual obligations to Argano, and Donyati's tortious interference with contracts, leave Argano no choice but to file this lawsuit seeking relief for the serious competitive harms to Argano caused by Defendants. Rather than develop or invest in its own technologies for cloud-based services, Donyati took a shortcut to the marketplace by stealing Argano's trade secrets and unfairly touting its supposed deep expertise in providing EPM cloud-based services—all of which was unlawfully gained through its misappropriation and tortious interference, and the

Individual Defendants' breach of contracts. Defendants' unlawful conduct upends Argano's substantial investments in its proprietary technology. Unless halted, Defendants' illegal actions will serve as a roadmap for other companies who have not acquired expertise lawfully, instead stealing the trade secrets of their competitors, and violating the intellectual property rights of true innovators. Simply put, Defendants' conduct must be stopped.

## THE PARTIES

11. Plaintiff Argano Ultimate Holdings, LLC is a Delaware limited liability company with a principal place of business located at 6100 West Plano Parkway, Suite 1800, Plano, Texas 75093.

12. Plaintiff Argano, LLC is a Texas limited liability company with a principal place of business located at 6100 West Plano Parkway, Suite 1800, Plano, Texas 75093.

13. Defendant Donyati, LLC is a Florida limited liability company that lists a principal address at 4850 Tamiami Trail North, Suite 301, Naples, Florida.

14. Defendant Ronald Guadagno is a former Vice President of Client Accounts at Argano who is currently employed by Donyati. Upon information and belief, he currently resides and may be served at 4543 Via Clarice, Santa Barbara, California 93111-1349.

15. Defendant Dyana Karcher is a former Senior Manager of Delivery at Argano who is currently employed by Donyati. Upon information and belief, she currently resides and may be served at 291 Wilson Drive, Prosper, Texas 75078-8583.

16. Defendant Melissa O'Blenis is a former Director of Change Management at Argano who is currently employed by Donyati. Upon information and belief, she currently resides and may be served at 7637 SW 65th Place Road, Ocala, Florida 34474-164.

17. Defendant William Posey is a former Lead Consultant at Argano who is currently employed by Donyati. Upon information and belief, he currently resides and may be served at 419 Forest Street, Lagrange, Ohio, 44050-9762.

18. Defendant Danielle White is a former Senior Director II of Delivery at Argano who is currently employed by Donyati. Upon information and belief, she currently resides and may be served at 7203 Vicuna Circle, Sachse, Texas, 75048-4605.

**JURISDICTION AND VENUE**

19. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises, in part, under the federal Defend Trade Secrets Act, 18 U.S.C. § 1832. *See also* 18 U.S.C. § 1836(c). This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

20. This Court has personal jurisdiction over Donyati based on Donyati's purposeful availment of and connections with Texas, including those that relate directly to and form the basis of trade secret misappropriation claims described in this Complaint. Donyati's activities include the actions of the Donyati Employees whom Donyati now employs (including the Individual Defendants who submitted to jurisdiction in this District), conducting business and promoting EPM-related services giving rise to this action, and offering opportunities for employment in the state of Texas and this District. The Donyati Employees were acting as agents of Donyati, and their access and use of Argano's trade secrets occurred after they accepted employment with Donyati, the downloading and use of information occurred within their role at Donyati. Donyati encouraged, ratified, and/or condoned the Donyati Employees' theft of Argano's trade secret information and is therefore at least vicariously liable for the Individual Defendants.

21. Donyati further has related connections with this District, including by purposefully availing itself of the privilege of conducting business in Texas, misappropriating trade secrets developed by Argano in Texas and stored in Texas,[2] and harming and continuing to harm Argano in this District by misappropriating and using Argano's trade secrets—which were created in and stolen from this District—to compete with Argano and interfere with the Donyati Employees' agreements with Argano. Additionally, the Donyati Employees were acting as agents of Donyati prior to their employment with Donyati, and as alleged herein, they performed acts of misappropriation after they accepted employment with Donyati, for purposes within the scope of their employment and for Donyati's benefit. Donyati also encouraged, ratified, and/or condoned the Donyati Employees' theft of Argano's trade secret information. Donyati is therefore at least vicariously liable for the Individual Defendants, and as such is subject to personal jurisdiction in the state of Texas and this District.

22. For example, Donyati identifies Hewlett Packard Enterprise and Builders FirstSource as customers on its website, and both are companies based in and/or with an office in this District. Donyati also lists on its website other EPM customers that identify Texas business addresses, including Skyward Specialty Insurance, Sunbelt Solomon Solutions, BenefitMall (now CRC Benefits), and Wilsonart. In March 2025, Donyati hosted an Oracle Cloud EPM Workshop for prospective customers in Fort Worth, Texas. In June 2025, Donyati partnered with the KScope 2025 conference, which covers EPM content, and gave speaking presentations at the same in Dallas-Fort Worth, Texas. Donyati also posted a job listing for "EPM/CPM Application Lead" for the location "5717 Legacy Drive, Suite 250, Plano, TX 75024," thus confirming it seeks to

[2] Argano uses the M365 environment for all services, and M365 operates data centers in Texas.

employ residents of this District.[3] Additionally, Defendant Danielle White lives in this District (specifically, Sasche, Texas) and thus has misappropriated Argano's trade secrets in this District and provided them to Donyati from this District. Defendants Dyana Karcher and William Posey downloaded Argano's confidential and trade secrets to an IP address located within this District (Prosper and Plano, Texas, respectively) while employed by Argano, in anticipated furtherance of their employment for Donyati and for Donyati's benefit. Defendants Ronald Guadagno, Danielle White, and Melissa O'Blenis also downloaded Argano's confidential and trade secrets to IP addresses located in San Antonio, Texas.

23. Defendants Dyana Karcher, Melissa O'Blenis, and William Posey also signed employment agreements with Argano containing confidentiality, non-solicitation, and non-competition obligations. Those agreements state that "[a]ny action or proceeding by either party to enforce this Agreement shall be brought only in any state or federal court located in or for Collin County, Texas. The Parties hereby irrevocably submit to the exclusive jurisdiction of such courts and waive the defense of inconvenient forum to the maintenance of any such action or proceeding in such venue." Ex. 1 § 15; Ex. 2 § 15; Ex. 3 § 15. These agreements also include a "Duty to Give Notice of Agreement," which states that the "Employee shall provide written notice to any prospective employer of Employee's obligations under this Agreement, and shall provide a true copy hereof to such prospective employer at the outset of any communications about employment." Ex. 1 § 7; Ex. 2 § 7; Ex. 3 § 7. Thus, Donyati should have been on notice of Argano's confidentiality, non-solicitation, and non-competition obligations at the outset of these Defendants' communications with Donyati and no later than February 2025, as Ms. O'Blenis'

---

[3] *Top Priority Jobs*, DONYATI, https://donyati.com/top-priority-jobs/ (last visited Sept. 7, 2025).

LinkedIn profile states she began working for Donyati in February 2025.[4] Defendants Ronald Guadagno and Danielle White also signed non-competition, non-solicitation, and confidentiality agreements with Argano. Those agreements state, "[t]he sole and exclusive venue for any dispute arising from or relating to this Agreement shall be in the State of Texas." Ex. 4 at Ex. B § 7(C); Ex. 5 at Ex. B § 7(C). On April 4, 2025, Argano also informed Donyati that Ms. White, Ms. O'Blenis, and Mr. Guadagno owed Argano certain contractual obligations. Ex. 6 (Donyati Letter). With full knowledge of these individuals' obligations to Argano in Texas, and of the employment agreements containing a mandatory venue clause in this District, Donyati continued to recruit Argano employees to misappropriate Argano's trade secrets for Donyati's benefit, and to induce those employees to breach their employee agreements with Argano.

24. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions as pleaded in the preceding paragraphs, which gave rise to this action, occurred in this District. The employment agreements signed by Defendants Dyana Karcher, Melissa O'Blenis, and William Posey identify that "[a]ny action or proceeding by either party to enforce this Agreement shall be brought only in any state or federal court located in or for Collin County, Texas." Ex. 1 § 15; Ex. 2 § 15; Ex. 3 § 15. The agreements signed by Defendants Ronald Guadagno and Danielle White identify Texas as "[t]he sole and exclusive venue for any dispute arising from or relating to this Agreement." As set forth in the preceding section, Donyati and the Individual Defendants misappropriated trade secrets created in this District, and in certain instances, downloaded them to this District. Donyati also tortiously interfered with obligations of Individual Defendants to Argano, while knowing that the underlying agreements had mandatory venue clauses naming courts in this District as the proper venue. Venue thus lies in this District.

4 https://www.linkedin.com/in/moblenis/ (last visited Sept. 22, 2025).

## ADDITIONAL FACTUAL ALLEGATIONS

### A. Argano's Trade Secrets Are Critical to Its Business and Success

25. Argano provides digital solutions that address technology needs for enterprise customers. For instance, Argano customizes and creates bespoke implementations of software purchased by its customers from large technology companies like Microsoft and Oracle. These reliable, high-quality, and efficient software solutions are the result of Argano's investment of significant time and resources. Argano invests heavily to support its engineering and business teams' creation of industry leading solutions, and it relies on its trade secrets and employee agreements to safeguard the intellectual property that results from its investments in the ingenuity and industry of its employees. One particular area of significant investment for Argano is its strategic alliance with Oracle. Argano's substantial and sustained partnerships with Oracle have resulted in Oracle's recognition of Argano's innovation, including in 2024, when Argano won the Oracle Partner Award North America, in the Innovation Category. Argano emphasizes to customers that it "is your single-source partner for Oracle Cloud consulting services and solutions."[5]

26. In a business decision designed to strategically expand Argano's ability to become a "single-source partner for Oracle Cloud consulting services," Argano acquired InterRel at a significant cost. InterRel was a premier EPM firm that focused on EPM services for over 20 years prior to the acquisition, was the longest-standing Oracle Platinum partner in the world, and was 100% dedicated to Oracle EPM and analytics. Argano's significant investment in InterRel deepened its EPM services offerings and further reflects the value Argano places on developing

---

5 *Oracle Cloud Consulting Services*, ARGANO, https://argano.com/technology/strategic-alliances/oracle.html (last visited July 29, 2025).

and expanding its Oracle Cloud consulting services for EPM, including by being a partner who can serve as a single stop for a wide array of services to a customer, *i.e.*, a single-source partner.

27. Argano's trade secrets represent a critical part of its ability to provide Oracle-related EPM services. For example, Argano has invested substantial time and money in accelerating implementation of Oracle EPM services for clients, for example, in the form of proprietary and confidential accelerators, scripts, and calculators. Migrating an on-premise system to a cloud-based system requires relocating data and applications, and then validating and optimizing performance post-migration. For enterprise customers who have immense quantities of data and applications, transitions—as well as services updating portions of cloud-based services post-transition—can be time-consuming, tedious, and error-prone. Argano utilizes proprietary accelerators, scripts, and calculators to make such transitions and subsequent upgrades more efficient and accurate. For example, accelerators are pieces of code that perform tasks associated with migration to cloud spaces, such as converting metadata into useable files, or converting business rules (*i.e.*, operational rules, which can include calculator scripts, that govern how a business's software functions) between different code languages. Test scripts are pieces of code that perform automated tests to ensure applications are running properly. Argano stores accelerators, scripts, and calculators in a repository and provides the programming code to clients. These tools provide significant value to Argano's customers, *e.g.*, by making the EPM implementation process for customers faster and more efficient.

28. As another example, Argano also creates and maintains confidential pipeline documents, which include the identities of customers that are not made public, as well as Argano's current and future-planned work associated with those customers. Pipeline documents would be extremely valuable to competitors, because they would allow competitors to quickly target

customers for EPM services work to lure away by offering Argano's trade secrets, such as its accelerators, scripts, and calculators, without having to research and analyze who likely customers might be.[6]

29. Argano also keeps a number of internal business documents, such as financial and business, training, and employee salary and commission documents, confidential. Overall, Argano has invested tremendous resources into the proprietary technologies and related documents and files it has generated for EPM, including proprietary integration solutions for customers.

30. Argano's trade secrets include certain Argano documents and files that the Donyati Employees downloaded on behalf of Donyati, including by sending files to their personal email accounts, downloading them to external USB devices to access post-employment with Argano, and even accessing them from a Donyati laptop. The Argano trade secrets, for instance, include confidential Argano documents relating to Argano's EPM integrations (the process of integrating data across a company's business by using planning, consolidation, and analytics), such as: (1) confidential and proprietary accelerators, scripts, and calculators, which are used to speed up implementations for customers (including, but not limited to, the file org.python.pydev_5.2.0.201608171824/pysrc/_pydevd_bundle/pydevd_cython.c, which contains code related to Argano's accelerators, scripts, and calculators); (2) confidential customer integration plans and work, which reflect solutions developed using Argano's expertise and resources (including, but not limited to, /Integration - Status Report Update WE11072019.docx); (3) confidential customer lists, both current and prospective, which include customers Argano does

6 As an example, Oracle identifies "EPM customer successes" and states that "almost 10,000 leading corporations worldwide trust Oracle to run their mission-critical business functions." https://www.oracle.com/performance-management/ (last visited Sept. 17, 2025). By targeting which customers Argano services and from whom Argano is bidding for work, the pipeline represents a silver platter of the portion of those customers most likely to be fruitful clients for new work.

not publicly identify for competitive purposes (including, but not limited to /1111 Sales Coverage - 2024/EPM Oracle Alignment EPM Tech 1-22-24.xlsx); and (4) confidential financial and business plans, which include key information about Argano's business structure, lessons learned from prior strategies and customer work, as well as forward-looking business strategies for identifying new leads and expanding work within current customers (including, but not limited to, the documents contained in the zip file D:\Change Mgmt\Downloads\one_page_business_transformation_continuous_flow_chart_presentation_report_infographic_ppt_pdf_document.zip).

31. The Argano trade secrets that Argano discovered were unlawfully downloaded by the Donyati Employees, within the scope and in furtherance of their work at Donyati, are the result of years of technological development and business acumen, are kept strictly confidential by Argano, and are critical to Argano's success in the marketplace, due in part to their secret and proprietary nature. Argano's efforts and investments in its EPM technologies over the years have resulted in substantial trade secrets that, together with other Argano intellectual property, have made Argano the world's largest digital consultancy. For these reasons, and others, Argano's proprietary EPM integration technologies and the corresponding design, testing, and implementation work it does for customers, which made its way to Donyati for Donyati's gain and benefit, are highly valuable assets belonging to Argano.

**B. Argano Deploys Substantial Measures to Ensure Its Trade Secrets Are Protected**

32. Argano has numerous ways in which it keeps its confidential information and trade secrets confidential. For example, Argano's IT department grants employees unique credentials to access Argano's trade secrets, ensuring Argano's trade secrets can only be accessed on a need-to-know basis. For example, employees who work on solutions for a specific client have access

to SharePoint locations for that client. However, employees who are not staffed to work on solutions for specific clients do not have access to those SharePoint locations.

33. Additionally, Argano's confidentiality measures are documented in its internal policy manuals, which are available to employees and which employees agree to observe. For example, Argano's Resource Guide states that "Arganauts must comply with all policies regarding confidentiality and protection of Argano's intellectual, business, and personal property." In addition to agreeing to such terms during the onboarding process, employees departing Argano undergo an exit interview and offboarding process. During such processes, employees are reminded that their obligations continue to apply after their employment with Argano ceases.

34. Argano also utilizes labels identifying certain information as proprietary and confidential, including labels such as "INTERAL USE ONLY!" and "External use or disclosure of any information contained in this document without the written permission of Argano, LLC (Argano) is prohibited." These labels are affixed on client design documents, documents involving pricing, and other Argano proprietary documents.

35. Argano also relies on employment agreements in which its employees agree to maintain the confidentiality of Argano's proprietary information, as well as commit to other obligations. During the course of their employment with Argano, each of the Individual Defendants executed such an employment agreement, as detailed further below. *See* Exs. 1-5. Argano requires such provisions in order to protect its valuable trade secrets and confidential documents and files. These agreements are supported by valuable consideration, as employees are able to work for Argano in return for their agreement. *See id*. And regardless of those agreements, all Argano employees understand their obligations to maintain the confidentiality of Argano's proprietary information, including the trade secrets at issue herein.

### C. The Individual Defendants Entered into Non-Compete, Non-Solicitation, and Confidentiality Obligations with Argano

36. Each of the Individual Defendants was employed at InterRel when Argano acquired InterRel. Accordingly, following the acquisition, the Individual Defendants became employees of Argano, just as InterRel's intellectual property became Argano's intellectual property. During the course of their employment with Argano, each of the Individual Defendants executed employment agreements containing non-competition, non-solicitation, and confidentiality obligations to Argano.

#### 1. Ronald Guadagno and Danielle White

37. As members of Argano's management team, Defendants Ronald Guadagno and Danielle White were eligible to participate in Argano's Management Option Plan, through which they could be granted options to purchase units of Argano.

38. Both Mr. Guadagno and Ms. White entered into nearly identical Award Agreements with Argano Ultimate Holdings, LLC, both dated April 1, 2024 (the "Award Agreements"). *See* Exs. 4, 5. The primary purpose of the Award Agreements was to grant Mr. Guadagno and Ms. White options to purchase units of Argano pursuant to the Management Option Plan. *See id.* In executing the Award Agreements, both Mr. Guadagno and Ms. White agreed to the following provision:

> **Non-Competition, Non-Solicitation and Confidentiality Agreement**. [Guadagno/White] acknowledges and agrees that, as consideration for the Granted Options, [Guadagno/White] shall enter into and deliver to [Argano] a Non-Competition, Non-Solicitation and Confidentiality Agreement, substantially in the form attached hereto as Exhibit B (which shall be binding upon and enforceable against [Guadagno/White] whether or not [Guadagno/White] ever exercises the Granted Options) (the "**Non-Competition Agreement**").

Ex. 4 § 3; Ex. 5 § 3.

39. Contemporaneous with Award Agreements, and attached to both as Exhibit B, Mr. Guadagno and Ms. White also executed Non-Competition, Non-Solicitation and Confidentiality Agreements with Argano Ultimate Holdings, LLC, both dated April 1, 2024 (the "Management Employment Agreements"). *See* Ex. 4 at Ex. B; Ex. 5 at Ex. B.

40. Section 2 of the Management Employment Agreements, in relevant part, contains the following confidentiality provision:

> **Non-Disclosure of Confidential Information**. [Guadagno/White] shall keep secret and hold in confidence, and shall not use for the benefit of [Guadagno/White] or any other Person (other than [Argano] or any of its subsidiaries), any and all information relating to [Argano] or any of its Subsidiaries that is proprietary to [Argano] or any of its Subsidiaries which may include, without limitation, information about their respective lists, proprietary product or system specifications, proprietary software code, production and other processes, data, compositions, designs, sketches, photographs, graphs, drawings, samples, technical know-how, inventions and ideas, past, current and planned research and development, vendor lists, customer lists, current and anticipated customer requirements, expert lists, price lists, market studies, financial statements and information and business plans (collectively, "**Confidential Information**") ….

Ex. 4 at Ex. B § 2; Ex. 5 at Ex. B § 2.

41. Section 3 of the Management Employment Agreements, in relevant part, contains the following non-solicitation provision:

> **Non-solicitation**. [Guadagno/White] agrees that [Guadagno/White] shall not, during his term as an employee, consultant or non-employee manager of [Argano] or any Subsidiary thereof, and for a period of twelve (12) months following the termination of such status for any reason, within the Restricted Area, individually or in conjunction with others, directly or indirectly, whether for his own account or that of any other Person:
>
> i. solicit, call on, transact or engage in any direct or indirect business activity for a purpose competitive with the business of [Argano] or any of its Subsidiaries, with any distributors, suppliers, experts or customers of [Argano] or any Subsidiary thereof with whom [Guadagno/White] shall have

> dealt on behalf of [Argano] or any of its Subsidiaries at any time during the period commencing one (1) year immediately prior to any termination of his relationship with [Argano];
>
> ii. solicit, employ or retain, or seek to solicit, employ or retain, or arrange to have any other Person solicit, employ or retain, any Person who has been employed or retained by [Argano] or any of its Subsidiaries as an employee, consultant, expert or independent contractor at any time during the period commencing one (1) year immediately prior to any termination of his relationship with [Argano]; …
>
> iii. interfere with, disrupt or attempt to disrupt, any then present or prospective relationship, contractual or otherwise, between [Argano] or any of its Subsidiaries, on the one hand, and any employee, consultant, agent, independent contractor, expert, supplier, distributor or customer thereof, on the other hand; ….

Ex. 4 at Ex. B § 3(A); Ex. 5 at Ex. B § 3(B).

42. Ms. White further agreed to the following non-compete provision in Section 3 of her Management Employment Agreement:

> **Non-competition**. [White] acknowledges and agrees that [White]'s covenants and agreements set forth in this Section 3 were a material inducement to [Argano] to enter into the Award Agreement and to perform its obligations thereunder. Accordingly, [White] agrees that [White] shall not, during his term as an employee, consultant or non-employee manager of [Argano] or any Subsidiary thereof, as applicable and for a period of six (6) months following terminating of such status for any reason, individually or in conjunction with others, directly or indirectly, whether for his own account or that of any other Person: (i) offer, provide, operate or otherwise engage or participate, directly or indirectly, in any Competitive Business within the Restricted Area, (ii) become an owner, principal, stockholder, lender, partner, co-venturer, independent contractor, proprietor, employee, officer, agent or consultant in or with respect to any portion of the business of a Person located or doing business within the Restricted Area, where such portion of such business is a Competitive Business or (iii) lend any assistance (whether financial, managerial, professional or otherwise) or cooperation to, or perform any services for, any such Competitive Business. …

Ex. 5 at Ex. B § 3(A).

43. Section 6 of the Management Employment Agreements contains the following equitable relief provision:

> **Equitable Relief**. It is expressly agreed among the parties hereto that monetary damages would be inadequate to compensate [Argano] for any breach by [Guadagno/White] of this Agreement. Accordingly, [Guadagno/White] agrees and acknowledges that any such breach or threatened breach is reasonably likely to cause irreparable injury to [Argano] and that, in addition to any other remedies at law or in equity to which [Argano] may be entitled and which may be ordered by a court of competent jurisdiction, [Argano] shall, as a matter of right, be entitled to obtain temporary and permanent injunctive relief in any court of competent jurisdiction against the actual or threatened breach of this Agreement or the continuation of any such breach by [Guadagno/White].

Ex. 4 at Ex. B § 6; Ex. 5 at Ex. B § 6.

44. Section 7(D) of the Management Employment Agreements provides that they "shall in all respects be construed, interpreted and enforced in accordance with, and governed by, the laws of the State of Texas" and that "[t]he sole and exclusive venue for any dispute arising from or relating to [the Management Employment Agreements] shall be in the State of Texas." Ex. 4 at Ex. B § 7(D); Ex. 5 at Ex. B § 7(D).

45. Ms. White's last day with Argano was October 31, 2024.

46. Mr. Guadagno's last day with Argano was March 4, 2025.

**2. Dyana Karcher, Melissa O'Blenis, William Posey, and Joe Aultman.**

47. During the course of their employment with Argano, Defendants Dyana Karcher, Melissa O'Blenis, and William Posey executed Restrictive Covenants Agreements with Argano, LLC, each dated January 1, 2025 (the "Non-Management Employment Agreements"). *See* Exs. 1-3. Under the Non-Management Employment Agreements, Argano agreed to employ each of

these Defendants in their respective positions, which employment could "be terminated at any time by either party with or without cause." Ex. 1 § 1; Ex. 2 § 1; Ex. 3 § 1.

48. Section 3 of the Non-Management Employment Agreements is titled "Covenants Not to Use or Disclose Confidential Information" and provides, in relevant part, as follows:

> a) The Employee agree and covenants:
>
> i) to treat all Confidential Information as strictly confidential;
>
> ii) not to directly or indirectly, disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any Entity or person whatsoever (including other Company employees), and not to permit or assist others to do so, except in conjunction with the Company Business and, in any event, not to anyone outside of the direct employ of the Company; and
>
> iii) not to directly or indirectly access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, and not to permit or assist others to do so, except as required in the performance of the Employees authorized employment duties to the Company.

*Id.* § 3(a).

49. Section 3 of the Non-Management Employment Agreements further provides that:

> the Employee's obligations under this Agreement regarding Confidential Information begins immediately upon the Employee first having access to any Confidential Information (whether before or after beginning employment with [Argano]) and shall continue during and after the Employee's employment by [Argano] until such time as such Confidential Information has become public knowledge other than as a result of the Employee's breach of this Agreement or breach by those acting in concert with Employee or on the Employee's behalf.

*Id.* § 3(b).

50. Section 5 of the Non-Management Employment Agreements is titled "Restrictive Covenants Regarding Company Employees and Customers" and provides, in relevant part, as follows:

> a) Non-Solicitation of Employees. During Employee's employment with Company and for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, engage in or assist others in soliciting, hiring, recruiting, or attempting to solicit, hire, or recruit any employee who is employed by the Company on the last day of Employee's employment or any person employed by the Company in the twelve (12) months preceding Employee's last day of employment with whom the Employee had regular business contact.
>
> b) Non-Solicitation of Customers. During Employee's employment with Company and for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the Company or relating to the Company Business.
>
> c) Non-Interference in Customer Relationships. During Employee's employment with Company and for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, (i) enter into an agreement with any Company Customer to provide goods and services similar to or competitive with those offered by the Company or relating to the Company Business, (ii) accept business from any Company Customer similar to or competitive with those offered by the Company or relating to the Company Business, (iii) encourage, facilitate, or assist any Company Customer to provide goods and services similar to or competitive with those offered by the Company or relating to the Company Business, (iv) provide goods or services relating to the Company Business to any Company Customer, whether as an employee, independent contractor, or otherwise; or (v) otherwise interfere in the relationship between the Company and any Company Customer.

*Id.* § 5.

51. Section 9 of the Non-Management Employment Agreements is titled "Remedies for Breach of Agreement" and provides as follows:

> Employee acknowledges that Employee's breach of any promise or covenant contained in paragraphs 3 through 5 will result in

> irreparable injury to Company and that Company's remedies at law for such a breach will be inadequate. Accordingly, Employee agrees and consents that Company, in addition to all other remedies available at law and in equity, shall be entitled to both preliminary and permanent injunctions to prevent and/or halt a breach or threatened breach by Employee of any such promise or covenant, and Employee waives the requirement of the posting of any bond in connection with such injunctive relief. Employee further acknowledges and agrees that the promises and covenants contained in paragraph 5 are ancillary to the otherwise enforceable promises contained herein and are reasonable and valid.

*Id.* § 9.

52. Section 15 of the Non-Management Employment Agreements provides that they, "and all matters arising out of or relating to [them], whether sounding in contract, tort, or statute, are governed by, and construed in accordance with, the laws of the State of Texas," and that "[a]ny action or proceeding by either party to enforce th[em] shall be brought only in any state or federal court located in or for Collin County, Texas." *Id.* § 15.

53. Mr. Aultman agreed to similar confidentiality obligations as an Argano employee, including those contained in Argano's Resource Guide, of which he was reminded and which he acknowledged during his Argano exit interview.

54. Ms. O'Blenis' last day with Argano was February 14, 2025.

55. Ms. Karcher's last day with Argano was March 12, 2025.

56. Mr. Posey's last day with Argano was April 25, 2025.

57. Mr. Aultman's last day with Argano was December 31, 2024.

### 3. In April 2025, Argano Reminded Donyati and Three of the Individual Defendants of Their Continuing Obligations to Argano

58. In the case of three Individual Defendants, Argano took additional steps to remind those employees—Ms. White, Ms. O'Blenis, and Mr. Guadagno—as well as Donyati, of those individuals' continuing obligations to Argano. On April 7, 2025, Argano sent letters to these three

Individual Defendants, reminding them of their "continuing post-employment obligations to the Company, including under the Non-Solicitation and Confidentiality Agreements between you and Argano Ultimate Holdings, LLC." Ex. 7 at 1; *see also* Exs. 8, 9. Also on April 7, 2025, Argano sent a letter to Donyati, putting it on notice that each of these three Individual Defendants "has continuing contractual and fiduciary obligations to Argano." Ex. 6 at 1.

59. The April 7, 2025 notice letters expressly reminded each of the three Individual Defendants and Donyati of the Individual Defendants' obligations to Argano:

> [Y]ou agreed that during your employment with the Company and for the six months thereafter you would not engage in any Competitive Business in the Restricted Area, or during your employment with the Company and for the 12 months thereafter, you would not, directly or indirectly, on your own behalf or another's behalf,
>
> 1. engage in or assist others in soliciting, recruiting or hiring any persons employed by the Company in the 12 months prior to your last day of employment with the Company;
>
> 2. solicit or contact or assist any other person or Entity to solicit or contact any Company Customer for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company;
>
> 3. enter into an agreement with or accept business from any Company Customer with respect to goods or services similar to or competitive with those offered by the Company; or
>
> 4. take any action that has the purpose of interfering in the relationship between the Company and any of its vendors.

Ex. 7 at 1-2; *see also* Exs. 6, 8, 9.

60. On April 13, 2025, Argano received duplicate responses from Ms. White and Mr. Guadagno. Both summarily confirmed receipt and stated that the individuals "affirm I am in compliance, and will continue to be in compliance . . . ." Ex. 10 at 1; Ex. 11 at 1. Those statements were false, as Argano would later learn. As alleged herein, each of those employees had, on behalf

and for the benefit of Donyati, misappropriated Argano's trade secrets leading up to and upon their departure from Argano. Argano did not receive any response from Ms. O'Blenis or Donyati.

### D. Defendants Misappropriated Argano's Trade Secrets

61. The Donyati Employees, including the Individual Defendants, unlawfully exfiltrated thousands of confidential Argano documents and files, including materials that are Argano trade secrets, for the benefit of themselves and Donyati, including by sending Argano files to their personal email accounts, downloading them to external USB devices, and even accessing them from a Donyati laptop. Argano discovered this theft, including its extent, only after learning of Donyati's rapid launch of and appearance competing for EPM services clients after hiring the Donyati Employees, and by conducting a forensic analysis of the Donyati Employees' Argano devices. This analysis ultimately revealed that, while at Donyati, the Donyati Employees had acquired, retained, accessed, and used Argano's trade secret information in connection with and furtherance of their employment at Donyati. A summary of the unlawful exfiltration uncovered by Argano to date is provided below.

#### 1. Joe Aultman

62. Mr. Aultman accepted employment with Donyati at least as early as December 9, 2024 when he submitted his resignation, as confirmed by his statement in his December 31, 2024 exit interview that he had a new employer, but did not want to share who it was. After submitting his resignation on December 9, 2024, and in the days leading up to his departure on December 31, 2024, Mr. Aultman downloaded nearly 40,000 documents from Argano's systems. This was a marked departure from Mr. Aultman's typical download activity—in the 6 months prior to his departure, fewer than 15 documents were recorded as downloaded by Mr. Aultman, a small fraction of what he downloaded in the 20 days before he left.

63. Mr. Aultman also shared four folders from Argano's SharePoint server with his Donyati email address joe.aultman@donyati.com on his last day of employment with Argano, confirming Mr. Aultman was accessing Argano's confidential and trade secret files in furtherance of his work at Donyati. The Argano SharePoint folders Mr. Aultman shared to his Donyati email address include confidential customer integration materials and scripting platform materials:

- https://arganosolutions.sharepoint.com/sites/. . ./Shared Documents/. . .-Phase 1
- https://arganosolutions.sharepoint.com/sites/. . ./Shared Documents/. . .-Phase 3
- https://arganosolutions.sharepoint.com/sites/. . ./Shared Documents/General
- https://arganosolutions.sharepoint.com/sites/EPMGroovy/Shared Documents/Documents

64. Further, Mr. Aultman connected a Samsung T7 external hard drive to his Argano work computer on January 1 and 2, 2025—*i.e.*, in the two days ***after*** his last day at Argano—which he used to download over 1.7 GB of data, including Argano's trade secrets. Mr. Aultman—acting in furtherance of Donyati—is still able to access the contents of the external hard drive that was not an Argano device and thus not required to be returned after his employment ended.

65. In the course of the downloads set forth above, Mr. Aultman took numerous Argano trade secret files. For example, after his resignation on December 9, 2024, and in the days leading up to his departure on December 31, 2024, Mr. Aultman downloaded numerous trade secret documents, including the following exemplary files from his OneDrive location that he used for work purposes while employed at Argano: https://arganosolutions-my.sharepoint.com/personal/it_interrel_argano_com/:

| **Filename and/or Partial Filepath** | **Description** |
|---|---|
| FXG - KT - FDMEE Event Scripts.pptx | Scripts, Accelerators, and Calculators |
| org.python.pydev_5.2.0.201608171824/pysrc/ _pydevd_bundle/pydevd_cython.c | Scripts, Accelerators, and Calculators |
| org.python.pydev_5.2.0.201608171824/pysrc/ | Scripts, Accelerators, and Calculators |

| | |
|---|---|
| _pydevd_bundle/pydevd_additional_thread_info.py | |
| / ExportedMetadata_Vintage Year.csv | Customer Integration Plans and Work |
| /. . . Integration - Status Report Update WE11072019.docx | Customer Integration Plans and Work |
| / Recordings/. . . Backup 031622.mp4 | Customer Integration Plans and Work |

66. These files include confidential and proprietary accelerators, scripts, and calculators that are used to speed up implementation of projects for customers. They also include confidential and proprietary customer integration plans and work documents that reflect solutions developed using Argano's expertise and resources. All were developed through the substantial effort of Argano employees and are critical to Argano's success in the marketplace, due in part to their secret and proprietary nature, given the competitive advantage Argano has as a result of the code contained in these files and its resulting ability to provide efficient integration services for customers, as well as to advertise its abilities in order to win new customers.

67. Mr. Aultman improperly acquired, retained, disclosed, and used Argano's trade secrets as an agent of Donyati and/or in furtherance of his Donyati job responsibilities and within the scope of his employment, for Donyati's benefit. Mr. Aultman never returned the external hard drive onto which he downloaded Argano trade secret files when he concluded his employment with Argano, and as such continues to have access to Argano's trade secrets for use in furtherance of his work with Donyati.

**2. Ronald Guadagno**

68. Mr. Guadagno accepted employment with Donyati at least as early as February 18, 2025 when he submitted his resignation, as confirmed by his statement in his February 25, 2025 exit interview that he was leaving Argano for a start-up that he had not heard of before. Mr. Guadagno had in fact been meeting with Donyati for months prior, at least as early as December 4, 2024, and regularly following that meeting, including on December 5, December 6, December

18, 2024; and January 24, February 5, 2025, including with Moe Gahary, Founder and Chief Executive Officer of Donyati and Havagi Sidram, President at Donyati. After submitting his resignation on February 18, 2024, in the weeks leading up to his departure on March 4, 2025, and coextensive with his multiple meeting with Donyati, Mr. Guadagno downloaded hundreds of files from Argano's systems. Because some of these files are email archives and zip files, the total file count is significantly higher. Unbeknownst to Argano at the time, Mr. Guadagno even used his Argano credentials to log into the Argano environment from his new Donyati laptop (DONYATPF5672J9) on March 3, 2025, before his last day at Argano. In other words, while Mr. Guadagno was still an active employee of Argano, Donyati had already provided him with a Donyati laptop, which Mr. Guadagno used to access Argano's network while still an Argano employee.

69. Mr. Guadagno downloaded numerous Argano trade secret files, such as the following files from a shared Argano SharePoint server and his OneDrive:

| **Filename and/or Partial Filepath** | **Description** |
|---|---|
| /August 2024/Strategy Corner Issue 2 Aug 2024.pdf | Financial and Business Plans |
| /Deal Review/. . ._Deal_Review_ . . . 06-25-2024.xlsx | Customer Integration Plans and Work |
| /Argano Cross Sell List . . ./. . ./. . .Research/Retail Accounts DaVinci 2-20-2023 - Copy.xlsx | Customer Integration Plans and Work |
| /2018-08-24 13.26 Ron_s Recurring Meeting.mp4 | Customer Integration Plans and Work |
| /. . . Automation Deal Review 2_13_2025.xlsx | Customer Integration Plans and Work |
| /Microsoft Teams Chat Files/Ronald Guadagno.zip | Customer Integration Plans and Work |
| /. . .-1010_Deal_Review_Estimate_Template.xlsx | Customer Integration Plans and Work |
| /CW2084965 2014Interrel001-001-A01 FINAL 12-22-2014.pdf | Customer Integration Plans and Work |
| /1111 Sales Coverage - 2024/EPM Oracle Alignment EPM Tech 1-22-24.xlsx | Customer List and Opportunities |
| / NYC_9.26.24/Sales Enablement 9.3.24/Oracle Sales Enablement_EPM PowerUp 9.26.24.pptx | Customer List and Opportunities |

| | |
|---|---|
| /CloudWorld_2024/CloudWorld 2024 V5 20240823.xlsx | Customer List and Opportunities |

70. Mr. Guadagno's downloads include confidential and proprietary financial and business plans, which include highly-valuable information about Argano's business structure, lessons learned from prior strategies and customer work, as well as forward-looking business strategies for identifying new leads and expanding work within current customers. These materials include information that would be highly valuable to a competitor, as they reflect Argano's confidential forward-looking strategy for its business. The downloads also include confidential and proprietary business customer integration plans and work reflecting valuable solutions for specific customers developed using Argano's expertise and resources. The downloads also include confidential and proprietary customer lists and customer opportunities, which reflect highly valuable information concerning Argano's current and prospective customers, including current work Argano is performing and opportunities Argano is seeking. Argano developed the trade secrets that Mr. Guadagno downloaded through the substantial effort of its employees, and they are critical to Argano's success in the marketplace, including as a result of their secret and proprietary nature. They give Argano a competitive advantage by being able to offer customers expertise and experience of prior solutions, as well as strategy for future business development, and Argano has invested time in researching and developing these highly valuable sales leads.

71. Mr. Guadagno conducted acts of misappropriation when he improperly acquired, retained, disclosed, and used Argano's trade secrets as an agent of Donyati and/or in furtherance of his Donyati job responsibilities and within the scope of his employment, for Donyati's benefit.

**3. William Posey**

72. Mr. Posey began meeting with Donyati at least as of March 6, 2025, again on March 19, 2025, before receiving an offer from Donyati dated April 4, 2025. In the weeks leading up to

his departure on April 25, 2025, Mr. Posey downloaded more than 4,000 documents from Argano's systems, including by repeatedly connecting his SanDisk Cruzer Glide USB device to his Argano work computer and transferring hundreds of documents to that USB device. This was a marked departure from Mr. Posey's typical download activity—in the 6 months prior to his departure, he downloaded less than 1,500 docs. But on a single day, just 20 days before he left Argano, he downloaded 4,000 documents, including onto an external device.

73. Mr. Posey downloaded numerous Argano trade secret files, including onto his SanDisk Cruzer Glide USB device during repeated downloading sessions and from filepaths expressly named "Argano Team Only":

| **Filename and/or Partial Filepath** | **Description** |
|---|---|
| D:\work\Utilities\Convert_Year_to_Month_data_file.xlsm | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\ecma.jar | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\ ecma.jar\oracle_epm_fm_optics_resource_Account.csv | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\ECMA.properties | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._Skeleton_Apps | Scripts, Accelerators, and Calculators |

| | |
|---|---|
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._Skeleton_Apps\NetAsset_. . ._12.zip | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._. . ._Apps\NetAsset_. . ._13.zip<br><br>D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._. . ._Apps\NetAssetBalSheet.zip | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._. . ._Apps\Trad_HYTD_12.zip | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._. . ._Apps\TraditionalBalSheet.zip | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._SAMPLE_EXPORTS | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._SAMPLE_EXPORTS\Metadata | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._ SAMPLE_EXPORTS\Metadata\. . ._Comma4_Artifacts.zip | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\. . ._ SAMPLE_EXPORTS\Metadata\. . ._SIMPLE3.zip | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\input | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\lib | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\lib\json.jar | Scripts, Accelerators, and Calculators |

| | |
|---|---|
| D:\work\Utilities\EPM Cloud Migration Accelerator\Migrations | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\Output | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\readme.txt | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\run_ecma.bat | Scripts, Accelerators, and Calculators |
| D:\work\Utilities\EPM Cloud Migration Accelerator\run_ecma.sh | Scripts, Accelerators, and Calculators |
| . . ._Metadata_Utility_v11.12.54.xlsm | Customer Integration Plans and Work |
| /Build/4. Test/System Integration Testing/1Compass Parallel data flow.pptx | Customer Integration Plans and Work |

74. Mr. Posey's downloads include confidential and proprietary accelerators, scripts, and calculators that are used to accelerate implementation of projects for customers. The confidential and proprietary customer integration plans and work documents include solutions developed using Argano's expertise and resources. The trade secrets that Mr. Posey downloaded were developed through the substantial effort of Argano employees, and are critical to Argano's success in the marketplace, including as a result of their secret and proprietary nature. They give Argano a competitive advantage because the code contained in these files provides Argano the ability to provide efficient integration services for customers and to advertise its abilities to win new customers.

75. Mr. Posey improperly acquired, retained, disclosed, and used Argano's trade secrets as an agent of Donyati and/or in furtherance of his Donyati job responsibilities and within the scope of his employment, for Donyati's benefit. Mr. Posey never returned the USB device when he concluded his employment with Argano, and as such continues to have access to Argano's trade secret for use in furtherance of his work with Donyati.

**4. Melissa O'Blenis**

76. Ms. O'Blenis first met with Donyati as early as January 6, 2025 and again on January 8, 9, and 10, 2025, including with Murali Konuri, Chief Technology Officer at Donyati. She accepted employment with Donyati at least as early as January 31, 2025 when she announced her resignation, as confirmed by her statement in her February 6, 2025 exit interview that she had a new employer whose identity she was not comfortable sharing. In the weeks leading up to her departure, Ms. O'Blenis continued to meet with Donyati, including at least on February 4, February 6, and February 7, 2025, including with Moe Gahary, the Founder and Chief Executive Officer of Donyati. During this time, Ms. O'Blenis downloaded over 2,000 documents from Argano's systems, including over 1,000 documents after the date of her resignation. This was a marked departure from Ms. O'Blenis' typical download activity—in the 6 months prior to her departure, she downloaded fewer than 400 docs, a small fraction of what she downloaded in the 15 days before she left.

77. Further, Ms. O'Blenis downloaded documents to an external hard drive on her last day of employment with Argano. Ms. O'Blenis—acting in furtherance of Donyati—is still able to access the contents of the external hard drive that was not an Argano device.

78. Ms. O'Blenis downloaded numerous Argano trade secret files, including the following files:

| **Filename and/or Partial Filepath** | **Description** |
|---|---|
| D:\Change Mgmt\Change Management\. . .\PRT Session_CostMgmt_012325.docx | Customer Integration Plans and Work |
| D:\Change Mgmt\Change Management\. . ._OCM_Playbook.pdf | Customer Integration Plans and Work |
| D:\Change Mgmt\Change Management\. . ._OCMProjectPlaybook_v1.pptx | Customer Integration Plans and Work |
| D:\Change Mgmt\Desktop\Argano 4 Oracle_OCM Playbook_V2.pptx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\2024-07-19 Argano DFH Oracle Cloud Implementation SOW v1.docx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\ALL ANSWERS-EXEC ALIGNMENT.xlsx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\BOracle EPM Implementation - Finance Kick-off-20241120_110221-Meeting Recording-en-US.docx<br>D:\Change Mgmt\Downloads\. . .- . . .- Quotes-20240916_172157-Meeting Recording-en-US.docx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\. . .- Customer Management-20240916_144132-Meeting Recording-en-US.docx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\. . .-. . . - Sub (Afternoon Session) End to End Testing-20240925_214342-Meeting Recording-en-US.docx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\. . . Console Cheat Sheet for Drivers.docx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\. . . . . .Test Script.xlsx | Scripts, Accelerators, and Calculators |
| D:\Change Mgmt\Downloads\. . .EPM Transformation Weekly Status 1-30-25.pptx | Customer Integration Plans and Work |
| D:\Change Mgmt\Downloads\one_page_business_transformation_continuous_flow_chart_presentation_report_infographic_ppt_pdf_document.zip | Customer Integration Plans and Work |

79. Ms. O'Blenis' downloads include confidential and proprietary customer integration plans and work reflecting valuable solutions for specific customers developed using Argano's expertise and resources. Argano developed these trade secrets through the substantial efforts of its employees, and the trade secrets are critical to Argano's success in the marketplace, including as a result of their secret and proprietary nature, and the competitive advantage Argano has a result of its ability to provide efficient integration services for customers and to advertise its abilities to win new customers.

80. Ms. O'Blenis improperly acquired, retained, disclosed, and used Argano's trade secrets as an agent of Donyati and/or in furtherance of her Donyati job responsibilities and within the scope of her employment, for Donyati's benefit. Ms. O'Blenis never returned the external hard drive onto which she downloaded Argano trade secret files when she concluded her employment with Argano, and as such, continues to have access to Argano's trade secrets for use in furtherance of her work with Donyati.

**5. Dyana Karcher**

81. Ms. Karcher accepted employment with Donyati at least as early as February 19, 2025 when she submitted her resignation, as confirmed by her statement in her exit interview that her new employer was Donyati. In the weeks leading to her departure on March 12, 2025, Ms. Karcher downloaded more than 550 files—many of which are zipped archives and appear to contain multiple documents within each of those files—including over 200 files after her resignation, and including files from the OneDrive location that Ms. Karcher used for work purposes while working for Argano, as indicated in the chart below. This was a marked departure from Ms. Karcher's typical downloaded activity—in the 6 months prior to her departure, she downloaded fewer than 25 docs, a small fraction of what she downloaded in the 30 days before she left.

82. Ms. Karcher downloaded numerous Argano trade secret files, including the following files:

| **Filename and/or Partial Filepath** | **Description** |
|---|---|
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/27 - . . ./Batch Scripts - . . ./ Batch Scripts/Dev_CUK_. . .Alloc_Fcst_calc_ working_1min.txt | Scripts, Accelerators, and Calculators |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/25 - . . ./Calc Manager 19-06-14.zip personal/dyana_karcher_argano_com/Documents/Consulting/Clients/12 - . . ./Documentation/. . .Plan1_ Billing/Calc Scripts/AGG.txt | Scripts, Accelerators, and Calculators |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/12 - . . ./Documentation/. . .Plan1 _Billing/Calc Scripts/Calc Billing.txt | Scripts, Accelerators, and Calculators |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/12 - . . ./Documentation/ . . .Plan1_Billing/Calc Scripts/Clear Block.txt | Scripts, Accelerators, and Calculators |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/27 - . . ./. . . EPMAutomate Copy App to UAT.sql | Customer Integration Plans and Work |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/27 - . . ./. . . EPMAutomate Copy App to UAT.sql | Customer Integration Plans and Work |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/27 - . . ./Batch Scripts - . . ..zip | Customer Integration Plans and Work |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/27 - . . ./Migration Steps . . ..docx | Customer Integration Plans and Work |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/27 - . . ./Workforce/Metadata/. . . Metadata Prior to Updates.zip | Customer Integration Plans and Work |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/23 - . . ./Metadata/Final Metadata.zip | Customer Integration Plans and Work |
| personal/dyana_karcher_argano_com/Documents/Consulting/Clients/12 - . . ./Documentation/. . .Consolidation reports.zip | Customer Integration Plans and Work |

83. Ms. Karcher's downloads include confidential and proprietary accelerators, scripts, and calculators that are used to speed up implementation of projects for customers. They also include confidential and proprietary customer integration plans and work documents that reflect solutions developed using Argano's expertise and resources. All were developed through the substantial effort of Argano employees, and are critical to Argano's success in the marketplace, including as a result of their secret and proprietary nature, given the competitive advantage Argano has a result of the code disclosed in these files and its resulting ability to provide efficient integration services for customers and to advertise its abilities to win new customers.

84. Ms. Karcher improperly acquired, retained, disclosed, and used Argano's trade secrets as an agent of Donyati and/or in furtherance of her Donyati job responsibilities and within the scope of her employment, for Donyati's benefit.

**E. Donyati Needed Argano's Employees and Trade Secrets to Compete**

85. Prior to stealing Argano's trade secrets and confidential documents and files, Donyati was performing certain types of upgrades in the Oracle EPM space. Specifically, Donyati was servicing Oracle's software applications, such as Hyperion, that are implemented on-site at client locations, or on a server. In other words, Donyati did not perform service work for cloud-based systems. There is no question this put Donyati at a significant competitive disadvantage to Argano, given the rapid growth of cloud infrastructure business, including Oracle's.[7] The rapid growth of the cloud-based market risked leaving Donyati (and its outdated offerings) in the dust.

86. Since the Donyati Employees joined Donyati—and misappropriated Argano's trade secrets on Donyati's behalf—Donyati has advanced its status as a competitor for cloud-based EPM

[7] Matt Kimball, *Oracle Cloud Has Achieved Momentum Through Differentiation*, FORBES (Feb. 13, 2024, 2:18 PM), https://www.forbes.com/sites/moorinsights/2024/02/13/oracle-cloud-has-achieved-momentum-through-differentiation/.

work at an accelerated pace that would not have been possible without Argano's trade secrets. For instance, Donyati is now actively competing against Argano for two customers for cloud-based EPM work. Donyati could not have done so prior to the misappropriation given its limited skillset and expertise, and could not have made such progress after hiring the Donyati Employees without the use of Argano's trade secrets. Donyati's progress in developing and marketing its cloud-based EPM services is possible because it misappropriated a wide swath of Argano's trade secrets that include Argano's proprietary information related to its accelerators, scripts, and calculators; its plans for integrating services, including for specific customers; its customer lists identifying prospective business opportunities; and its financial and business plans—which provided a technical, business and financial roadmap Donyati could not have obtained lawfully.

87. The significance to Donyati of Argano's EPM cloud-related trade secrets is confirmed by Donyati's public statements after the misappropriation occurred: following Donyati's targeting and hiring of the Donyati Employees (and acquisition of Argano's trade secret and confidential documents and files), Donyati claimed that its "strength lies in our deep knowledge of the Oracle EPM ecosystem."[8] Donyati chose to highlight a client success story, stating: "Our premium client needed to transform their on-prem Consolidations environment from HFM [Hyperion Financial Management] to FCCS [Financial Consolidation and Close Service] Cloud to retain support from Oracle and reduce ongoing support and administration costs."[9] In other words, Donyati is using Argano's trade secrets in order to bid for, win, and perform EPM cloud-related upgrade services and then market its wins to try to win more work stemming from the misappropriation.

[8] *Oracle Partner*, DONYATI, https://donyati.com/oracle-partner/ (last visited July 28, 2025).

[9] *Id.*

**F. The Individual Defendants Breached Their Employment Agreements, and Donyati Tortiously Interfered with the Employment Agreements.**

88. Each of the Individual Defendants breached their obligations to Argano set forth in the agreements they signed.

89. Mr. Guadagno breached his confidentiality obligations. Mr. Guadagno agreed to not disclose Argano's confidential information. Specifically, he agreed to "keep secret and hold in confidence, and shall not use for the benefit of Participant or any other Person . . . any and all information relating to the company or any of its Subsidiaries that is proprietary to the Company or any of its Subsidiaries which may include . . . financial statements and information and business plans . . . ." Ex. 4 at Ex. B § 2. Mr. Guadagno breached that obligation by downloading more than 550 files containing Argano's confidential and proprietary financial and business plans before his last day of employment with Argano, including because he could not possibly have any use for those downloaded documents except to "benefit . . . Participant or any other Person." *Id.* Mr. Guadagno also accessed the Argano environment from his Donyati laptop, which further evidences Mr. Guadagno used and is using Argano's confidential information for Donyati's benefit in breach of his confidentiality obligations.

90. Mr. Guadagno also breached his non-solicitation obligation. Mr. Guadagno agreed not to "solicit, call on, transact or engage in any direct or indirect business activity for a purpose competitive with the business of the Company," "individually or in conjunction with others, directly or indirectly . . . ." *Id.* § 3(A)(i). Mr. Guadagno breached that obligation by working as Chief Revenue Officer for Donyati, which is at least an "indirect business activity for a purpose competitive with the business of the Company . . . ." *Id.*

91. Ms. Karcher breached her confidentiality obligations. Ms. Karcher agreed "not to copy any documents, records, files, media, or other resources containing Confidential Information

. . . except as required in the performance of the Employee's authorized employment duties to the Company." Ex. 1 § 3(a)(iii). Ms. Karcher also agreed not to "retain any copies, electronic or otherwise, of any Confidential Information." *Id.* § 4. Ms. Karcher breached her obligation by downloading more than 550 Argano files in the weeks leading to her departure, including accelerators, scripts, and calculators and confidential and proprietary customer integration plans and work documents. The downloaded files fall within the enumerated categories of "Confidential Information" identified in the agreement. *E.g.*, *id.* § 16(e) ("trade secrets and other information developed, provided, or used by the Company that is not generally known to the public").

92. Ms. Karcher also breached her non-solicitation obligations. Ms. Karcher agreed not to "directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the Company or relating to the Company Business." *Id.* § 5(b). Ms. Karcher breached her obligation by working as the Director, Oracle EPM at Donyati, where she assists Donyati in competing against Argano by offering EPM services that are similar and competitive to those offered by Argano.

93. Ms. O'Blenis breached her confidentiality obligations. Ms. O'Blenis agreed "not to copy any documents, records, files, media, or other resources containing Confidential Information . . . except as required in the performance of the Employee's authorized employment duties to the Company." Ex. 2 § 3(a)(iii). Ms. O'Blenis also agreed not to "retain any copies, electronic or otherwise, of any Confidential Information." *Id.* § 4. Ms. O'Blenis breached her obligation by downloading over 2,000 documents reflecting confidential and proprietary customer

integration plans and work from Argano's systems, including to an external hard drive that she did not return to Argano when departing.

94. Ms. O'Blenis also breached her non-solicitation obligations. Ms. O'Blenis agreed not to "directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the Company or relating to the Company Business." *Id.* § 5(b). Ms. O'Blenis breached her obligation by working as the Vice President, Organizational Change Management at Donyati, where she assists Donyati in competing against Argano by offering EPM services that are similar and competitive to those offered by Argano. As an example, Ms. O'Blenis posted on LinkedIn that her "work life = OCM [Organizational Change Management] for EPM [Enterprise Performance Management]."

95. Mr. Posey breached his confidentiality obligations. Mr. Posey agreed "not to copy any documents, records, files, media, or other resources containing Confidential Information . . . except as required in the performance of the Employee's authorized employment duties to the Company." Ex. 3 § 3(a)(iii). Mr. Posey also agreed not to "retain any copies, electronic or otherwise, of any Confidential Information." *Id.* § 4. Mr. Posey breached his obligation by downloading hundreds of documents onto an external USB device, including accelerators, scripts, and calculators and client files.

96. Mr. Posey also breached his non-solicitation obligations. Mr. Posey agreed not to "directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the

Company or relating to the Company Business." *Id.* § 5(b). Mr. Posey breached his obligation by working as the Director/Solution Architect at Donyati, where he assists Donyati in competing against Argano by offering EPM services that are similar and competitive to those offered by Argano.

97. Ms. White breached her non-solicitation obligation. Ms. White agreed not to "solicit, call on, transact or engage in any direct or indirect business activity for a purpose competitive with the business of the Company," "individually or in conjunction with others, directly or indirectly . . . ." Ex. 5 § 3(A)(i). Ms. White also agreed not to "offer, provide, operate or otherwise engage or participate, directly or indirectly, in any Competitive Business within the Restricted Area" "for a period of six (6) months following terminat[ion]." *Id.* § 3(A). Ms. White breached that obligation by working as Senior VP, Marketing & Alliances for Donyati, which is at least an "indirect business activity for a purpose competitive with the business of the Company . . . ." *Id.*

98. Ms. White also agreed not to "solicit, employ or retain, or seek to solicit, employ or retain, or arrange to have any other Person solicit, employ or retain, any Person who has been employed or retained by the Company or any of its Subsidiaries as an employee . . . ." *Id.* § 3(B)(ii). Ms. White breached her obligation when she solicited Grace Halliday, then an Argano employee, to come work at Donyati. Ms. White also breached her obligation when she solicited Mr. Guadagno, then an Argano employee, to come work at Donyati, including by meeting with him on December 5, 2024.

99. Donyati caused Individual Defendants to breach their non-solicitation and non-competition obligations. Donyati was aware that Individual Defendants had such obligations. The Non-Management Employment Agreement signed by Ms. O'Blenis includes a "Duty to Give

Notice of Agreement," which states that the "Employee shall provide written notice to any prospective employer of Employee's obligations under this Agreement, and shall provide a true copy hereof to such prospective employer at the outset of any communications about employment." Ex. 2 § 7. Thus, Donyati should have been on notice of Argano's non-solicitation and non-competition obligations at the outset of Ms. O'Blenis' communications with Donyati and no later than February 2025, as Ms. O'Blenis' LinkedIn profile states she began working for Donyati in February 2025.[10] Additionally, on April 7, 2025, Argano informed Donyati and three Individual Defendants (Ms. White, Ms. O'Blenis, and Mr. Guadagno) in writing that the three Individual Defendants had signed and were subject to the non-solicitation, non-compete, confidentiality, and other contractual obligations. Ex. 6.

100. Donyati caused these Individual Defendants to breach their non-solicitation obligations in a number of ways. For example, Donyati placed the Individual Defendants in roles competitive to those the employees previously held at Argano. For example, Mr. Guadagno signed Argano emails using the title Chief Revenue Officer. After leaving Argano on March 4, 2025, Mr. Guadagno began working at Donyati in March 2025 as Chief Revenue Officer.

101. As another example, Donyati touts the specific EPM experience of Ms. O'Blenis—the area in which she is not allowed to compete or solicit customers—on its LinkedIn page. While at Argano, Ms. O'Blenis was a senior leader in the EPM group. Donyati now posts Ms. O'Blenis on its LinkedIn page, advertising her EPM skills to target employees and customers in a way competitive to Argano's EPM services offerings and customers: [11]

---

[10] https://www. linkedin.com/in/moblenis/ (last visited Sept. 22, 2025).

[11] Donyati, LINKEDIN (Aug. 12, 2025, 1:27 PM), https://www.linkedin.com/posts/donyati_donyati-changeleadership-ocm-activity-7361025585499811843-PqpZ .




102. As another example, while at Argano, Mr. Aultman held the role Management Consultant – Strategic Assessments, in which he had access to Argano files written in the Apache Groovy programming language within Oracle's EPM cloud applications. Specifically, Mr. Aultman shared an "EPMGroovy" SharePoint file location with himself prior to his departure from

Argano. Donyati now features Mr. Aultman on its LinkedIn page, and specifically highlights the Groovy Scripting for EPM training that Mr. Aultman is offering on behalf of Donyati:[12]




---

12 Donyati, LINKEDIN (Aug. 14, 2025, 4:15 PM), https://www.linkedin.com/posts/donyati_groovy-oracle-oracleepm-activity-7361792494239387648-KgOb.

**COUNT I**

**Trade Secret Misappropriation Under
The Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq.
(against all Defendants)**

103. Argano re-alleges and incorporates by reference the allegations above as though fully set forth herein.

104. Argano owns certain valuable trade secrets in and relating to the software services it provides, including with respect to its EPM solutions. These trade secrets include: (1) scripts, accelerators, and calculators; (2) customer integration plans and work; (3) customer lists and opportunities; and (4) financial and business plans, both current and forecasted, as described above. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Argano, and Argano has expended significant time and money developing such confidential information and trade secrets. These trade secrets and confidential information, as described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

105. The above-detailed confidential trade secrets that Donyati and the Individual Defendants acquired, accessed, and/or used derive independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means to other persons or entities who might obtain economic value from their disclosure or use. Resulting from years of research, development, and substantial cost to Argano, these trade secrets are foundational to Argano's competitive advantages in the cloud EPM consulting market.

106. Argano has taken the above-described reasonable measures to protect the secrecy of its trade secrets and confidential documents and files, including that which Donyati and the Individual Defendants misappropriated. These measures include setting forth confidentiality terms in employee agreements and the Argano Resource Guide; agreements not to keep property

belonging to Argano, such as documents, software, storage devices, and hardware (including, without limitation, laptops and other computes); and, in accordance with the other measures described above, electronic security measures such as limiting access to certain documents for certain employees, and labeling documents as Argano's proprietary and/or confidential documents and files.

107. Argano afforded all Donyati Employees access to and use of Argano's confidential information and trade secrets in connection with their work at Argano. Donyati Employees had a duty to maintain as confidential Argano's trade secrets, including under the terms of their employee agreements with Argano, in which they expressly acknowledged and confirmed the confidential nature of these secrets.

108. As stated above, Argano's trade secret and confidential documents and files relate to EPM services used, sold, or purchased, or intended for use, sale, or purchase, across the United States (including Argano's EPM service offerings, and its related integrations, which are offered and supplied to customers throughout the United States, including numerous customers for numerous projects in this District), as well as throughout the world.

109. Donyati—both directly and through Donyati Employees' access while they were employed at Argano—acquired, accessed, disclosed, and/or used Argano's trade secrets and confidential material by improper means, without Argano's express or implied consent, and in violation of Donyati Employees' confidentiality obligations to Argano, including through the employee agreements and other confidentiality measures described above.

110. Donyati actually misappropriated Argano's trade secrets and confidential information to benefit itself, and to allow Donyati to unfairly compete against and harm Argano by acquiring and using Argano's trade secrets, including in this District. Donyati improperly

acquired Argano's trade secrets and has since improperly used and disclosed those trade secrets, including to influence the development and release of technologies offered by Donyati (including in connection with its EPM cloud-related services, where Donyati previously only competed for non-cloud related EPM services prior to luring the Donyati Employees to Donyati) to compete with Argano's offerings (including Oracle EPM and its related cloud-related integrations). With Argano's trade secrets in hand, Donyati has quickly transformed its business in a period of time that would not have been possible without them. Donyati now markets its new cloud-based EPM services to clients it could not have previously served with its limited expertise. Thus, as a result of its misappropriation, Donyati is now able to directly compete with Argano in the marketplace and is doing so at least for two customers. Misappropriation of this type of information undermines Argano's competitive position in the market for these offerings. Further, after their respective last days working for Argano (between October 2024 and April 2025), the Donyati Employees unlawfully kept extensive Argano trade secrets which they have used and disclosed at Donyati during the course of their employment, as alleged herein.

111. Donyati and the Individual Defendants knew or had reason to know at the time they acquired, accessed, disclosed, and used Argano's trade secrets and confidential documents and files that this information is confidential and was acquired and maintained by improper means, and/or under circumstances giving rise to a duty to maintain secrecy or limit use, including by virtue of their confidentiality obligations. Donyati and the Individual Defendants further knew or had reason to know that this information was developed or acquired by Argano at great expense and effort. Donyati and the Individual Defendants further knew or had reason to know that Argano maintains this information as confidential, and that this information is not generally available to

the public or Argano's competitors, such that having this information would provide significant benefits to a competitor like Donyati seeking to compete with Argano.

112. Donyati and the Individual Defendants improperly acquired and participated in the disclosure and use of Argano's trade secrets, including while the Donyati Employees have been employed by Donyati. For example, Joe Aultman shared the contents of four SharePoint folders with his Donyati email address. As another example, Ronald Guadagno accessed numerous files in the Argano environment from a laptop provided to him by Donyati. Further, Donyati Employees have used and disclosed Argano's trade secrets within the course and scope of their employment at Donyati, including because they have titles and roles that mirror those at Argano. Donyati has benefited from and will continue to benefit from that use, including by continuing to design and implement Donyati's new products and services offerings with the benefit of Argano's trade secrets, marketing its new cloud-based EPM services, and competing with Argano for customers Donyati previously could not serve with its outdated offerings.

113. Donyati and Argano are competitors in the technology solutions industry, including for Oracle EPM services and solutions.

114. Further, the Donyati Employees are acting as agents of Donyati, and their access and use of Argano's trade secrets occurred after they accepted employment with Donyati, with approval of Donyati and knowledge of Donyati Employees' obligations to Argano, and within the scope of their employment with Donyati. In doing so, the Donyati Employees were acting on Donyati's behalf and at Donyati's instruction, were subject to Donyati's control, and consented to do so. The Donyati Employees' unlawful actions, including downloading Argano's trade secret information and using such information in their role with Donyati, occurred within the scope of their employment with Donyati and was, at least in part, for the benefit of Donyati to give Donyati

an unfair advantage against Argano. Donyati encouraged, ratified, and/or condoned the Donyati Employees' theft of Argano's trade secret information, and has knowingly received the benefit of the Donyati Employees' trade secret misappropriation. Donyati is therefore at least vicariously liable for the Individual Defendants' actions, in addition to being directly liable for their ratification of the Donyati Employees' misappropriation of trade secrets, as well as their own inappropriate acquisition, use, and disclosure of Argano's trade secrets as alleged herein.

115. At no time has Argano consented to Donyati's or Individual Defendants' improper acquisition, disclosure, or use of Argano's trade secrets for any reason, including for any purpose related to Donyati Employees' employment with Donyati.

116. Thus, Donyati and Individual Defendants have engaged in the actual and threatened misappropriation of Argano's confidential information in violation of the DTSA.

117. Donyati's and Individual Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

118. Donyati and Individual Defendants are retaining and using Argano's trade secrets and confidential information to compete with and/or otherwise harm Argano. As alleged herein, Donyati and Individual Defendants have committed numerous acts in furtherance of their misappropriation in the United States and in this District, including misappropriating trade secrets that they obtained and/or originated from this District with knowledge and intent to harm Argano in this District, as well as attempting to sell and/or selling (and/or facilitating selling) services in the U.S. and this District that were influenced by and otherwise benefit from Donyati's and Individual Defendants' theft.

119. Donyati's and Individual Defendants' misappropriation has proximately caused damage to Argano, including, but not limited to, loss of profits, goodwill, competitive advantage, and business opportunities—for which Argano will seek damages and/or injunctive relief.

120. Donyati and Individual Defendants have been unjustly enriched as a further proximate result of their misappropriation of Argano's trade secrets and confidential information—for which Argano also is seeking damages.

121. Donyati's and Individual Defendants' actions in misappropriating Argano's trade secrets and confidential information were willful, fraudulent, malicious, and done with the intent to injure and oppress Argano and improve Donyati's and Individual Defendants' own economic opportunities, thereby justifying an award of punitive damages against Donyati and Individual Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C), and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

122. Argano is also entitled to injunctive relief to protect its confidential information and trade secrets, including by (1) enjoining Donyati and Individual Defendants from further possessing, using, or disclosing Argano's trade secret and confidential documents and files; (2) enjoining Donyati and Individual Defendants from altering or deleting Argano's trade secret and confidential documents and files, or any related evidence, until a forensic investigation can be performed to determine the extent of Donyati's and Individual Defendants' use; and (3) requiring Donyati and Individual Defendants to turn over any and all copies of Argano's trade secret and confidential information, and information derived therefrom, to Argano.

**COUNT II**
**Breach of Contract**
**(against Defendant Ronald Guadagno)**

123. Argano re-alleges and incorporates by reference the allegations above as though fully set forth herein.

124. Defendant Ronald Guadagno voluntarily entered into the Management Employment Agreement with Argano Ultimate Holdings, LLC. *See* Ex. 4 at Ex. B.

125. The Management Employment Agreement between Ronald Guadagno and Argano Ultimate Holdings, LLC is a valid and enforceable contract that imposes certain restrictions on Guadagno.

126. Argano adequately performed as required under the Management Employment Agreement.

127. Pursuant to Section 2 of his Management Employment Agreement, Mr. Guadagno agreed not to disclose or use Argano's Confidential Information. Argano has legitimate business interests in protecting its Confidential Information, including to preserve its competitive advantage over competing companies like Donyati. Mr. Guadagno has breached this provision of his Management Employment Agreement, including, without limitation, by exfiltrating Argano's Confidential Information, disclosing Argano's Confidential Information to Donyati, and using Argano's Confidential Information in the course of his employment with Donyati.

128. Pursuant to Section 3(A)(i) of his Management Employment Agreement, for a period of one year, Mr. Guadagno agreed not to solicit, call on, transact, or engage in any direct or indirect business activity for a purpose competitive with Argano's business with any distributors, suppliers, experts, or customers of Argano with whom Mr. Guadagno dealt in the year prior to his departure from Argano. Mr. Guadagno has breached this provision of his Management

Employment Agreement, including, without limitation, by engaging in direct and indirect business activity for the purpose of competing with Argano's business with customers with whom Mr. Guadagno dealt in the year prior to his departure from Argano.

129. Pursuant to Section 3(A)(ii) of his Management Employment Agreement, for a period of one year, Mr. Guadagno agreed not to solicit, employ, or retain; seek to solicit, employ, or retain; or arrange to have any other person solicit, employ, or retain, any person who has been employed or retained by Argano in the year prior to his departure from Argano. Mr. Guadagno has breached this provision of his Management Employment Agreement, including, without limitation, by soliciting or arranging to have other persons solicit persons employed by Argano in the year prior to his departure.

130. Pursuant to Section 3(A)(iii) of his Management Employment Agreement, for a period of one year, Mr. Guadagno agreed not to interfere with, disrupt, or attempt to disrupt, any then present or prospective relationship, contractual or otherwise, between Argano and any employee, consultant, agent, independent contractor, expert, supplier, distributor, or customer. Mr. Guadagno has breached this provision of his Management Employment Agreement, including, without limitation, by interfering with Argano's present or prospective relationships with its employees and customers.

131. Argano has suffered damages as a result of Mr. Guadagno's breaches of contract. Such damages are, however, insufficient to provide a full and complete remedy to Argano.

132. Unless restrained, enjoined, and ordered to specifically abide by his obligations in his Management Employment Agreement, Mr. Guadagno will persist in his breaches of contract, thereby causing irreparable damage to Argano.

133. Argano has no adequate remedy at law, as the full value of the revenue, profit, and Confidential Information presently being lost, or threatened to be lost, due to Mr. Guadagno's breaches of contract is and will be difficult, if not impossible, to ascertain.

134. Pursuant to Section 6 of his Management Employment Agreement, Mr. Guadagno agreed that monetary damages are inadequate to compensate Argano for his breach of the Management Employment Agreement, and that Argano is entitled, in addition to any other remedies, to obtain temporary and permanent injunctive relief against Mr. Guadagno's actual or threatened breaches.

**COUNT III**
**Breach of Contract**
**(against Defendant Danielle White)**

135. Argano incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

136. Defendant Danielle White voluntarily entered into the Management Employment Agreement with Argano Ultimate Holdings, LLC. *See* Ex. 5 at Ex. B.

137. The Management Employment Agreement between Ms. White and Argano Ultimate Holdings, LLC is a valid and enforceable contract that imposes certain restrictions on Ms. White.

138. Argano adequately performed as required under the Management Employment Agreement.

139. Pursuant to Section 2 of her Management Employment Agreement, Ms. White agreed not to disclose or use Argano's Confidential Information. Argano has legitimate business interests in protecting its Confidential Information, including to preserve its competitive advantage over competing companies like Donyati. Ms. White has breached this provision of her Management Employment Agreement, including, without limitation, by exfiltrating Argano's

Confidential Information, disclosing Argano's Confidential Information to Donyati, and using Argano's Confidential Information in the course of her employment with Donyati.

140. Pursuant to Section 3(A) of her Management Employment Agreement, for a period of six months, Ms. White agreed not to participate, directly or indirectly, in any Competitive Business within the Restricted Area. Ms. White has breached this provision of her Management Employment Agreement by acting as an employee of Donyati within the six months following the end of her employment with Argano.

141. Pursuant to Section 3(B)(i) of her Management Employment Agreement, for a period of one year, Ms. White agreed not to solicit, call on, transact, or engage in any direct or indirect business activity for a purpose competitive with Argano's business with any distributors, suppliers, experts, or customers of Argano with whom Ms. White dealt in the year prior to her departure from Argano. Ms. White has breached this provision of her Management Employment Agreement, including, without limitation, by engaging in direct and indirect business activity for the purpose of competing with Argano's business with customers with whom Ms. White dealt in the year prior to her departure from Argano.

142. Pursuant to Section 3(B)(ii) of her Management Employment Agreement, for a period of one year, Ms. White agreed not to solicit, employ, or retain; seek to solicit, employ, or retain; or arrange to have any other person solicit, employ, or retain, any person who has been employed or retained by Argano in the year prior to her departure from Argano. Ms. White has breached this provision of her Management Employment Agreement, including, without limitation, by soliciting or arranging to have other persons solicit persons employed by Argano in the year prior to her departure.

143. Pursuant to Section 3(B)(iii) of her Management Employment Agreement, for a period of one year, Ms. White agreed not to interfere with, disrupt, or attempt to disrupt, any then present or prospective relationship, contractual or otherwise, between Argano and any employee, consultant, agent, independent contractor, expert, supplier, distributor, or customer. Ms. White has breached this provision of her Management Employment Agreement, including, without limitation, by interfering with Argano's present or prospective relationships with its employees and customers.

144. Argano has suffered damages as a result of Ms. White's breaches of contract. Such damages are, however, insufficient to provide a full and complete remedy to Argano.

145. Unless restrained, enjoined, and ordered to specifically abide by her obligations in her Management Employment Agreement, Ms. White will persist in her breaches of contract, thereby causing irreparable damage to Argano.

146. Argano has no adequate remedy at law, as the full value of the revenue, profit, and Confidential Information presently being lost, or threatened to be lost, due to Ms. White's breaches of contract is and will be difficult, if not impossible, to ascertain.

147. Pursuant to Section 6 of her Management Employment Agreement, Ms. White agreed that monetary damages are inadequate to compensate Argano for her breach of the Management Employment Agreement, and that Argano is entitled, in addition to any other remedies, to obtain temporary and permanent injunctive relief against Ms. White's actual or threatened breaches.

**COUNT IV**
**Breach of Contract**
**(against Defendant Melissa O'Blenis)**

148. Argano incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

149. Defendant Melissa O'Blenis voluntarily entered into the Non-Management Employment Agreement with Argano, LLC. *See* Ex. 2.

150. The Non-Management Employment Agreement between Ms. O'Blenis and Argano, LLC is a valid and enforceable contract that imposes certain restrictions on Ms. O'Blenis.

151. Argano adequately performed as required under the Non-Management Employment Agreement.

152. Pursuant to Section 3 of her Non-Management Employment Agreement, except in connection with her employment by Argano, Ms. O'Blenis agreed not to: (1) disclose, publish, communicate, or make available Argano's Confidential Information; (2) directly or indirectly access or use Argano's Confidential Information; (3) copy any documents, records, files, media, or other resources containing Argano's Confidential Information; or (4) remove any such documents, records, files, media, or other resources from the premises of her employment or from control of Argano. Argano has legitimate business interests in protecting its Confidential Information, including to preserve its competitive advantage over competing companies like Donyati. Ms. O'Blenis has breached this provision of her Non-Management Employment Agreement, including, without limitation, by exfiltrating Argano's Confidential Information, disclosing Argano's Confidential information to Donyati, and using Argano's Confidential Information in the course of her employment with Donyati.

153. Pursuant to Section 5(a) of her Non-Management Employment Agreement, for a period of one year, Ms. O'Blenis agreed not to directly or indirectly engage in or assist others in soliciting, hiring, or recruiting any person employed by Argano with whom she had regular business contact in the year prior to her departure from Argano. Ms. O'Blenis has breached this provision of her Non-Management Employment Agreement, including, without limitation, by soliciting or arranging to have other persons solicit Argano employees with whom Ms. O'Blenis had regular business contact in the year prior to her departure from Argano.

154. Pursuant to Section 5(b) of her Non-Management Employment Agreement, for a period of one year, Ms. O'Blenis agreed not to directly or indirectly assist any other person in soliciting, contacting, or attempting to solicit or contact any Argano customer for the purpose of offering goods or services competitive with those offered by Argano. Ms. O'Blenis has breached this provision of her Non-Management Employment Agreement, including, without limitation, by assisting Donyati in soliciting, contacting, or attempting to solicit or contact an Argano customer for the purpose of offering competing goods or services.

155. Pursuant to Section 5(c) of her Non-Management Employment Agreement, for a period of one year, Ms. O'Blenis agreed not to directly or indirectly encourage, facilitate, or assist any Argano customer to provide goods and services similar to or competitive with those provided by Argano. Ms. O'Blenis has breached this provision of her Non-Management Employment Agreement, including, without limitation, by encouraging, facilitating, or assisting Donyati to provide similar or competitive goods and services to Argano customers.

156. Argano has suffered damages as a result of Ms. O'Blenis' breaches of contract. Such damages are, however, insufficient to provide a full and complete remedy to Argano.

157. Unless restrained, enjoined, and ordered to specifically abide by her obligations in her Management Employment Agreement, Ms. O'Blenis will persist in her breaches of contract, thereby causing irreparable damage to Argano.

158. Argano has no adequate remedy at law, as the full value of the revenue, profit, and Confidential Information presently being lost, or threatened to be lost, due to Ms. O'Blenis' breaches of contract is and will be difficult, if not impossible, to ascertain.

159. Pursuant to Section 9 of her Non-Management Employment Agreement, Ms. O'Blenis agreed that her breaches of her Non-Management Employment Agreement will result in irreparable injury to Argano for which legal remedies are inadequate. Ms. O'Blenis further agreed that Argano is entitled, in addition to any other remedies, to obtain temporary and permanent injunctive relief against Ms. O'Blenis' actual or threatened breaches.

**COUNT V**
**Breach of Contract**
**(against Defendant William Posey)**

160. Argano incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

161. Defendant William Posey voluntarily entered into the Non-Management Employment Agreement with Argano, LLC. *See* Ex. 3.

162. The Non-Management Employment Agreement between Mr. Posey and Argano, LLC is a valid and enforceable contract that imposes certain restrictions on Mr. Posey.

163. Argano adequately performed as required under the Non-Management Employment Agreement.

164. Pursuant to Section 3 of his Non-Management Employment Agreement, except in connection with his employment by Argano, Mr. Posey agreed not to: (1) disclose, publish,

communicate or make available Argano's Confidential Information; (2) directly or indirectly access or use Argano's Confidential Information; (3) copy any documents, records, files, media, or other resources containing Argano's Confidential Information; or (4) remove any such documents, records, files, media, or other resources from the premises of his employment or from control of Argano. Argano has legitimate business interests in protecting its Confidential Information, including to preserve its competitive advantage over competing companies like Donyati. Mr. Posey has breached this provision of his Non-Management Employment Agreement, including, without limitation, by exfiltrating Argano's Confidential Information, disclosing Argano's Confidential information to Donyati, and using Argano's Confidential Information in the course of his employment with Donyati.

165. Pursuant to Section 5(a) of his Non-Management Employment Agreement, for a period of one year, Mr. Posey agreed not to directly or indirectly engage in or assist others in soliciting, hiring, or recruiting any person employed by Argano with whom he had regular business contact in the year prior to his departure from Argano. On information and belief, Mr. Posey has breached this provision of his Non-Management Employment Agreement, including, without limitation, by soliciting or arranging to have other persons solicit Argano employees with whom Mr. Posey had regular business contact in the year prior to his departure from Argano.

166. Pursuant to Section 5(b) of his Non-Management Employment Agreement, for a period of one year, Mr. Posey agreed not to directly or indirectly assist any other person in soliciting, contacting, or attempting to solicit or contact any Argano customer for the purpose of offering goods or services competitive with those offered by Argano. Mr. Posey has breached this provision of his Non-Management Employment Agreement, including, without limitation, by

assisting Donyati in soliciting, contacting, or attempting to solicit or contact an Argano customer for the purpose of offering competing goods or services.

167. Pursuant to Section 5(c) of his Non-Management Employment Agreement, for a period of one year, Mr. Posey agreed not to directly or indirectly encourage, facilitate, or assist any Argano customer to provide goods and services similar to or competitive with those provided by Argano. Mr. Posey has breached this provision of his Non-Management Employment Agreement, including, without limitation, by encouraging, facilitating, or assisting Donyati to provide similar or competitive goods and services to Argano customers.

168. Argano has suffered damages as a result of Mr. Posey's breaches of contract. Such damages are, however, insufficient to provide a full and complete remedy to Argano.

169. Unless restrained, enjoined, and ordered to specifically abide by his obligations in his Management Employment Agreement, Mr. Posey will persist in his breaches of contract, thereby causing irreparable damage to Argano.

170. Argano has no adequate remedy at law, as the full value of the revenue, profit, and Confidential Information presently being lost, or threatened to be lost, due to Mr. Posey's breaches of contract is and will be difficult, if not impossible, to ascertain.

171. Pursuant to Section 9 of his Non-Management Employment Agreement, Mr. Posey agreed that his breaches of his Non-Management Employment Agreement will result in irreparable injury to Argano for which legal remedies are inadequate. Mr. Posey further agreed that Argano is entitled, in addition to any other remedies, to obtain temporary and permanent injunctive relief against Mr. Posey's actual or threatened breaches.

**COUNT VI**
**Breach of Contract**
**(against Defendant Dyana Karcher)**

172. Argano incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

173. Defendant Dyana Karcher voluntarily entered into the Non-Management Employment Agreement with Argano, LLC. *See* Ex. 1.

174. The Non-Management Employment Agreement between Ms. Karcher and Argano, LLC is a valid and enforceable contract that imposes certain restrictions on Ms. Karcher.

175. Argano adequately performed as required under the Non-Management Employment Agreement.

176. Pursuant to Section 3 of her Non-Management Employment Agreement, except in connection with her employment by Argano, Ms. Karcher agreed not to: (1) disclose, publish, communicate or make available Argano's Confidential Information; (2) directly or indirectly access or use Argano's Confidential Information; (3) copy any documents, records, files, media, or other resources containing Argano's Confidential Information; or (4) remove any such documents, records, files, media, or other resources from the premises of her employment or from control of Argano. Argano has legitimate business interests in protecting its Confidential Information, including to preserve its competitive advantage over competing companies like Donyati. Ms. Karcher has breached this provision of her Non-Management Employment Agreement, including, without limitation, by exfiltrating Argano's Confidential Information, disclosing Argano's Confidential information to Donyati, and using Argano's Confidential Information in the course of her employment with Donyati.

177. Pursuant to Section 5(a) of her Non-Management Employment Agreement, for a period of one year, Ms. Karcher agreed not to directly or indirectly engage in or assist others in soliciting, hiring, or recruiting any person employed by Argano with whom she had regular business contact in the year prior to her departure from Argano. Ms. Karcher has breached this provision of her Non-Management Employment Agreement, including, without limitation, by soliciting or arranging to have other persons solicit Argano employees with whom Ms. Karcher had regular business contact in the year prior to her departure from Argano.

178. Pursuant to Section 5(b) of her Non-Management Employment Agreement, for a period of one year, Ms. Karcher agreed not to directly or indirectly assist any other person in soliciting, contacting, or attempting to solicit or contact any Argano customer for the purpose of offering goods or services competitive with those offered by Argano. Ms. Karcher has breached this provision of her Non-Management Employment Agreement, including, without limitation, by assisting Donyati in soliciting, contacting, or attempting to solicit or contact an Argano customer for the purpose of offering competing goods or services.

179. Pursuant to Section 5(c) of her Non-Management Employment Agreement, for a period of one year, Ms. Karcher agreed not to directly or indirectly encourage, facilitate, or assist any Argano customer to provide goods and services similar to or competitive with those provided by Argano. Ms. Karcher has breached this provision of her Non-Management Employment Agreement, including, without limitation, by encouraging, facilitating, or assisting Donyati to provide similar or competitive goods and services to Argano customers.

180. Argano has suffered damages as a result of Ms. Karcher's breaches of contract. Such damages are, however, insufficient to provide a full and complete remedy to Argano.

181. Unless restrained, enjoined, and ordered to specifically abide by her obligations in her Management Employment Agreement, Ms. Karcher will persist in her breaches of contract, thereby causing irreparable damage to Argano.

182. Argano has no adequate remedy at law, as the full value of the revenue, profit, and Confidential Information presently being lost, or threatened to be lost, due to Ms. Karcher's breaches of contract is and will be difficult, if not impossible, to ascertain.

183. Pursuant to Section 9 of her Non-Management Employment Agreement, Ms. Karcher agreed that her breaches of her Non-Management Employment Agreement will result in irreparable injury to Argano for which legal remedies are inadequate. Ms. Karcher further agreed that Argano is entitled, in addition to any other remedies, to obtain temporary and permanent injunctive relief against Ms. Karcher's actual or threatened breaches.

**COUNT VII**
**Tortious Interference with Contract**
**(against Donyati)**

184. Argano re-alleges and incorporates by reference the allegations above as though fully set forth herein.

185. Each of the following Individual Defendants signed and is subject to non-solicitation, non-compete, and confidentiality terms: Danielle White, Melissa O'Blenis, Ronald Guadagno, Dyana Karcher, and William Posey.

186. On April 1, 2024, Ms. White entered into the Management Employment Agreement, in which she agreed:

- to hold Argano's confidential information secret and not use such information for the benefit of herself or any other company, Ex. 5 at Ex. B § 2;

- not to "engage or participate, directly or indirectly, in any Competitive Business within the Restricted Area" for six months following her employment with Argano, *id.* § 3(A).;
- not to "individually or in conjunction with others, directly or indirectly, . . . solicit, call on, transact or engage in any direct or indirect business activity for a purpose competitive" with Argano for twelve months following termination of each Former Employee's termination from Argano, *id.* § 3(B); and
- not to "solicit, employ or retain, or seek to solicit, employ or retain . . . any Person who has been employed or retained by the Company or any of its Subsidiaries as an employee, expert or independent contractor," *id.*

Ex. 5 at Ex. B. Ms. White's last day with Argano was October 31, 2024.

187. On January 1, 2025, Ms. O'Blenis entered into a Non-Management Employment Agreement, in which she agreed:

- "to treat all Confidential Information as strictly confidential;"
- "not to copy any documents, records, files, media, or any resources containing any Confidential Information";
- "not retain any copies, electronic or otherwise, of any Confidential Information";
- "for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, engage in or assist others in soliciting, hiring, recruiting, or attempting to solicit, hire, or recruit any employee who is employed by the Company";
- "for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the Company or relating to the Company Business";

Ex. 2. Ms. O'Blenis' last day with Argano was February 14, 2025.

188. On April 1, 2024, Mr. Guadagno entered into a Management Employment Agreement, in which he agreed:

- to hold Argano's confidential information secret and not use such information for the benefit of herself or any other company, Ex. 4 at Ex. B § 2;

- not to "individually or in conjunction with others, directly or indirectly, . . . solicit, call on, transact or engage in any direct or indirect business activity for a purpose competitive" with Argano for twelve months following termination of each Former Employee's termination from Argano, *id.* § 3(A); and

- not to "solicit, employ or retain, or seek to solicit, employ or retain . . . any Person who has been employed or retained by the Company or any of its Subsidiaries as an employee, expert or independent contractor," *id.*

Ex. 4 at Ex. B. Mr. Guadagno's last day with Argano was March 4, 2025.

189. On January 1, 2025, Ms. Karcher entered into a Non-Management Employment Agreement, in which she agreed:

- "to treat all Confidential Information as strictly confidential;"

- "not to copy any documents, records, files, media, or any resources containing any Confidential Information";

- "not retain any copies, electronic or otherwise, of any Confidential Information";

- "for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, engage in or assist others in soliciting, hiring, recruiting, or attempting to solicit, hire, or recruit any employee who is employed by the Company";

- "for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the Company or relating to the Company Business";

Ex. 1. Ms. Karcher's last day with Argano was March 12, 2025.

190. On April 25, 2025, Mr. Posey entered into a Non-Management Employment Agreement, in which he agreed:

- "to treat all Confidential Information as strictly confidential;"
- "not to copy any documents, records, files, media, or any resources containing any Confidential Information";
- "not retain any copies, electronic or otherwise, of any Confidential Information";
- "for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, engage in or assist others in soliciting, hiring, recruiting, or attempting to solicit, hire, or recruit any employee who is employed by the Company";
- "for a period of twelve (12) months thereafter, Employee shall not, directly or indirectly, on Employee's own or another's behalf, solicit, contact, or attempt to solicit or contact, or assist any other person or Entity to do so, any Company Customer for purpose of offering or accepting goods or services similar to or competitive with those offered by the Company or relating to the Company Business";

Ex. 3. Mr. Posey's last day with Argano was April 25, 2025.

191. Each of the aforementioned agreements is valid, binding, enforceable, and supported by adequate legal consideration.

192. Donyati knew of these agreements when it caused these employees to breach these agreements. On April 7, 2025, Argano informed Donyati and three Individual Defendants (Ms. White, Ms. O'Blenis, and Mr. Guadagno) in writing that the three Individual Defendants had signed and were subject to the non-solicitation, non-compete, confidentiality, and other contractual obligations of each Non-Management Employment Agreement. Ex. 6. Out of an abundance of caution, Argano attached the agreements containing these employees' non-solicitation, non-compete, confidentiality, and other contractual obligations to the end of each letter to the Individual Defendants.

193. Two of the Individual Defendants (Ms. White and Mr. Guadagno) responded with nearly identical emails, demonstrating a coordinated response. Donyati orchestrated the

coordinated responses of its employees and continues to induce, assist, and otherwise cause these Individual Defendants to breach their contractual obligations to Argano.

194. Additionally, Ms. Karcher, Ms. O'Blenis, and Mr. Posey should have notified Donyati of their non-compete and non-solicitation obligations to Argano when they began communicating with Donyati. Each of these Individual Defendants agreed to "provide written notice to any prospective employer of Employee's obligations under this Agreement, and shall provide a true copy hereof to such prospective employer at the outset of any communications about employment." Ex. 1 § 7; Ex. 2 § 7; Ex. 3 § 7.

195. Donyati's inducement of these breaches was intentional. For example, Donyati induced the employees' breach of their obligations to Argano with full knowledge of those obligations and no justifications for their breach. Moreover, Donyati placed the employees in positions having overlapping responsibilities and duties as the positions the employees held at Argano, causing them to breach their obligation not to compete with Argano. For example, Donyati made Mr. Guadagno its Chief Revenue Officer, which was the same position he held at Argano. As another example, Donyati features Ms. O'Blenis on its LinkedIn page, advertising her EPM skills to target employees and customers in violation of her non-solicitation and non-interference obligations to Argano. The Individual Defendants with non-solicitation obligations solicited, hired, or recruited, directly or indirectly, later-joining former Argano employees in direct violation of their non-solicit obligations. Donyati induced, assisted, or otherwise caused—and continues to do so today with knowledge—each Individual Defendant to violate the non-solicitation and non-compete obligations.

196. Donyati's actions have unlawfully impaired and damaged Argano's legitimate business interests. Donyati's conduct was without justification or privilege and constitutes unlawful, tortious, wrongful, and unfair interference with Argano's contractual rights.

197. Donyati's conduct constitutes tortious interference with Argano's contractual rights, and as a result, Argano has incurred substantial damages, including damages stemming from any Individual Defendant's solicitation of current Argano employees and/or customers in violation of the express terms of the referenced agreements—the terms of which Donyati is aware.

198. Donyati acted with malice or a fraudulent intent to harm Argano and improve Donyati's own economic opportunities, thereby justifying an award of punitive damages against Donyati.

## **JURY DEMAND**

199. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Argano demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Argano prays for relief as follows:

200. Award judgment in favor of Argano and against Donyati and the Individual Defendants on Argano's trade secret misappropriation claim asserted in its Complaint;

201. Award judgment in favor of Argano and against Donyati on Argano's tortious interference with contract claim asserted in its Complaint;

202. Award judgment in favor of Argano and against each Individual Defendant on Argano's breach of contract claims asserted in its Complaint;

203. Award preliminary and/or permanent injunctive relief prohibiting Donyati and the Individual Defendants, and all those acting on their behalf or in active concert or participation with

them, from possessing, using, and disclosing Argano's trade secrets; Award a preliminary and/or permanent injunction requiring Donyati and Individual Defendants to return all stolen information and documents (and all material derivative from such information) to Argano;

204. Declare that Donyati and the Individual Defendants have no rights or privileges to use Argano's confidential information or trade secrets;

205. Award Argano damages in an amount to be determined at trial, including, without limitation, Argano's lost revenues and profits, and any unjust enrichment, restitution, or disgorgement, breach of contract damages, tortious interference with contract damages, plus a reasonable royalty to the extent permitted under the law;

206. Award Argano punitive damages in an amount to be determined;

207. Award Argano pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action; and

208. For such other and further relief as the Court may deem to be just and proper.

Dated: September 23, 2025

Respectfully submitted,

By: */s/ Taj J. Clayton, P.C.*

Taj J. Clayton, P.C. (Texas Bar No. 24050427)
Carson D. Young (Texas Bar No. 24106613)
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: 214 432 4931
Facsimile: 214 972 1771

Adam Alper, P.C. (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
Telephone: 415 439 1400
aalper@kirkland.com

Michael W. DeVries, P.C. (admitted in E.D. Texas)
Yimeng Dou, Ph.D. (admitted in E.D. Texas)
Yungmoon Chang (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
695 Town Center Dr, Suite 1700
Costa Mesa, CA 92626
Telephone: 310 552 4200
michael.devries@kirkland.com
yimeng.dou@kirkland.com
yungmoon.chang@kirkland.com

J. Travis Underwood (Texas Bar No. 24102587)
GILLAM & SMITH LLP
303 South Washington Ave.
Marshall, TX 75670
Telephone: 903 934 8450
Facsimile: 903 934 9257
travis@gillamsmithlaw.com

**ATTORNEYS FOR PLAINTIFFS**